UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSEPH F. KAMINSKI,

     Plaintiff,

vs.                                                    CASE NO. 8:12-cv-00826-T-24-MAP

BP EXPLORATION & PRODUCTION INC.,
and BP AMERICA PRODUCTION COMPANY

     Defendants.
_____/

## ORDER

     This cause comes before the court on Defendants BP Exploration and Production Inc. and

BP America Production Company's (collectively, "BP") Motion to Dismiss for failure to state a

claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure. (Dkt. 18.)  Plaintiff Joseph F. Kaminski filed a response in opposition to the motion.

(Dkt. 21.)  BP filed a reply.  (Dkt. 28.)  For the reasons stated herein, the motion is denied.

**I.     Background**

     On or about March 23, 2012, Plaintiff filed a Complaint against Defendants in the Circuit

Court of the Sixth Judicial Circuit in and for Pinellas County, Florida. (Dkt. 2.)  Plaintiff's

Complaint is based on events related to BP's efforts to control the Macondo oil well blowout

following the explosions and fire on the Deepwater Horizon rig that occurred on April 20, 2010.

Plaintiff alleges that BP breached an implied contract and was unjustly enriched by using three

ideas that Plaintiff submitted to BP: an insertion pipe idea, a "Top Hat" with thermal lifting idea,

and a riser spool and two-pin riser spool flange alignment idea.

In his Complaint, Plaintiff alleges the following: on May 11, 2010 at 10:24 p.m., Plaintiff called the BP Help Hotline and explained his insertion pipe idea to representatives.  He explained that the idea could be used to collect oil by inserting a smaller pipe into the broken pipe past the break and inflate sealing rings.  A technical support representative then requested Plaintiff's email address in order to forward him a form to fill out and return to the Horizon Support Team ("HST").  At 10:33 p.m., Plaintiff received that email, which requested the following information: a brief description of the technology, the required materials and equipment, and Plaintiff's contact information and areas of expertise.  Plaintiff immediately began documenting at least three of his ideas.  On May 12, 2010 at 2:49 p.m., Plaintiff sent an email to HST explaining the insertion pipe idea.

On May 13, 2010 at 12:46 a.m., Plaintiff sent HST an email saying that he wanted at least two million dollars for his assistance, ideas, and designs if used and also explaining why the "Top Hat" will not work as designed by BP.  On May 13, 2010 at 8:13 a.m., Plaintiff received an email from HST rejecting his proposal. Early that morning, Plaintiff emailed U.S. Congressman Gus Bilirakis' office and complained that BP appeared to be rejecting his solutions automatically by email.

On May 13, 2010 at 1:30 p.m., Plaintiff received a telephone call from Attorney Elizabeth Hittos, Legislative Counsel for U.S. Congressman Bilirakis, in response to his email. After a few minutes of Plaintiff's explanation, Hittos requested that she be able to call him back and initiate a three-way phone call with BP. Hittos called Plaintiff back, and as she was asked questions by BP representatives on the line, Hittos conveyed those questions to Plaintiff. Plaintiff then offered the following information: the idea that the oil might be drawn into a tanker on the surface; the likely success of a Junk Shot idea; the location of where inflatable seals might be

purchased; the likely success of a smaller pipe and rubber baffles; and his opinion that the best

idea would be to use the largest pipe possible, thick rubber, three to five equally spaced flap

seals, and an insertion pipe of five to twenty feet long. Plaintiff was also asked to explain the

flow diversion method aspect of the insertion pipe idea, but he responded that there were too

many details to explain.

After the BP representatives disconnected, Hittos requested that Plaintiff send her the

information he had previously sent to BP so that she could send it to the Unified Command,

which was being assembled to solve the problem. Hittos asked Plaintiff what he wanted for his

help, to which he replied that he wanted at least two million dollars, as he had requested in

emails to HST. Hittos then requested copies of those emails and the email from HST rejecting

the insertion pipe idea. She also told Plaintiff that she wanted to meet with him in the

Congressman's office in Tarpon Springs, Florida.

On May 13, 2010 at approximately 3:00 p.m., BP announced to the press that it had

decided on a "recent new proposal."  MSBNC reported that BP was setting aside the "Top Hat"

strategy to instead attempt to siphon the oil to a tanker on the surface using a small tube

surrounded by a stopper and threaded into the jagged pipe gushing oil from the seafloor.

Plaintiff alleges that, before May 13, 2010, BP made no mention of the insertion pipe, and the

"recent new proposal" was in fact Plaintiff's insertion pipe idea.

On May 13, 2010 at 2:47 p.m. Plaintiff emailed HST regarding what he considered its

acceptance of his insertion pipe idea, requesting to help more directly.  At 3:01 p.m. that same

day, Plaintiff began to forward the requested emails to Hittos, reiterating his request for two

million dollars. At 3:23 p.m. and 6:37 p.m. that day, Plaintiff emailed Hittos additional

information regarding the insertion pipe idea. At 7:56 p.m. that day, Plaintiff emailed Hittos to

say that BP needed to have lines on the insertion pipe in order to pull and hold it in.

On May 14, 2010 at 3:10 p.m., Plaintiff received another rejection email from HST and

forwarded that email to Hittos at 4:34 p.m.   At 10:43 p.m. that day, Plaintiff received an email

from Hittos asking him to look at a slide show of BP's plan and specifically tell her where BP

was going wrong so that she could point out its inherent mistakes in the next conference call.

One minute later, at 10:44 p.m., Plaintiff then received an email entitled "BP Gulf of Mexico

Update" and the slideshow of BP's plan. The update had been released earlier that day at 3:00

p.m. and stated that a "Riser Insertion Tube" had been fabricated and lowered to the sea floor.

The update explained that one end would be attached to a riser and drill pipe that would run to a

tanker on the surface, while the other end would be inserted into the ruptured pipe. Engineers

expected to move the equipment into place that night. The update also noted that a "top hat" with

anti-freeze ports to mitigate frozen hydrates had been deployed to the sea floor in case it was

needed. The update concluded by saying that "this technology has never been done at this water

depth," and "[s]ignificant technological and operational challenges" had to be overcome for

success.

On May 15, 2010 at 12:16 a.m., Plaintiff emailed his detailed answers in response to

Hittos' May 14th email request for assistance. Later that morning at 2:50 a.m., Plaintiff emailed

Hittos to reiterate his advice that lines were needed on the insertion pipe, including drawings in

the email. Later that day at 8:11 p.m., Plaintiff emailed Hittos to suggest injecting warm upper

seawater into the "Top Hat" to create a thermal lifting action, including a drawing in the email.

Shortly thereafter at 9:22 p.m., Plaintiff received an email from Hittos requesting that their

meeting be rescheduled in order to allow Plaintiff to listen in on a conference call with the

4

Unified Command. At 11:41 p.m. that night, Plaintiff emailed Hittos further clarification on how to improve the design of the "Top Hat."

On May 16, 2010 at 12:53 p.m., Plaintiff received an email that had been forwarded from Hittos that contained an update from the Unified Command. The update stated the following: the Riser Insertion Tube Tool was successfully inserted overnight and had captured some oil and gas that was then stored in a tanker, although the tool had become temporarily dislodged at one point. The tool was fashioned from a four inch pipe and then a five foot length of the "specifically-designed tool" was inserted into the leaking riser in a procedure never before attempted at such depths. Methanol would be flowed into the riser to prevent the formation of hydrates.

On May 16, 2010 at 6:46 p.m., MSNBC reported that BP had achieved its first success since the oil spill began. The report explained that engineers had been working since Friday, May 14 to place a four-inch tube into a twenty-one inch pipe, and Sunday, May 16, BP had successfully began to siphon oil. In the report, BP's Senior Executive Vice President Kent Wells said that BP would just "learn as [they] go" with the approach, as it had never before been successful a mile below the surface.

On May 17, 2010, BP released a statement to the press announcing that the "Top Hat" could be used with the insertion pipe to increase collection of oil. All of the top hats had been modified to have warm surface seawater pumped in to create a thermal lifting action. Also that day, BP released a video of the insertion pipe working, and Plaintiff alleges that the picture in the video was the same as the drawing Plaintiff sent in his May 15th email to Hittos.

From May 19, 2010 through July, 2010, Plaintiff continued to work to develop a viable plan to remove the riser and install a blowout preventer with Hittos, HST, BP, and Professor

Robert Bea, Center for Catastrophic Risk Management, Department of Civil and Environmental Engineering, UC Berkley. Using diagrams sent to him, Plaintiff: devised a stint pipe that BP later called the "Riser Spool"; provided plans to cradle and steer away the old riser pipe with surface ship lines during removal; and provided a two-pin design for riser spool flange alignment to install a blowout preventer.

Upon these allegations, among others, Plaintiff asserts six claims for relief against BP. Counts I, II, and III are for breach of implied-in-fact contract for BP's use of Plaintiff's invention, idea, design, and ongoing engineering services relating to the insertion pipe, the "Top Hat" with thermal lifting, and the riser spool and two-pin flange alignment, respectively. Counts IV, V, and VI are for unjust enrichment of BP through its use of Plaintiff's invention, idea, and design relating to the insertion pipe, the "Top Hat" with thermal lifting, and the riser spool and two-pin flange alignment, respectively.

On April 16, 2012, BP removed this action to this Court. On June 1, 2012, BP moved to dismiss each of Plaintiff's claims for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.     Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a short and plain statement of the claim showing the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Although Rule 8 does not require a claimant to set out in detail the facts upon which he bases his claim, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss, a complaint must allege sufficient facts, accepted as true,

to state a plausible claim for relief. *Id.* Where a complaint contains well-pleaded facts, if those facts "do not permit the court to infer more than the mere possibility of misconduct," the complaint stops short of plausibility and does not show the plaintiff is entitled to relief. *Id.* at 1950. Furthermore, while the Court must assume that all of the factual allegations in the complaint are true, this assumption is inapplicable to legal conclusions. *Id.* at 1949. The door to discovery will not open for a plaintiff "armed with nothing more than legal conclusions." *Id.* at 1950.

## III.   Discussion

BP moves to dismiss each of Plaintiff's claims for failure to state a claim upon which relief can be granted under Rule 12(b)(6). BP contends that Plaintiff failed to plausibly allege the element of novelty for all three ideas, an element that is required to state a claim for breach of implied contract and for unjust enrichment. BP further contends that Plaintiff failed to plausibly allege that he disclosed two of the ideas to BP, the "Top Hat" with thermal lifting idea and the riser spool and two-pin flange alignment idea, and therefore, Plaintiff's claims must fail.

### A.  BP's Arguments that Plaintiff Failed to Plausibly Allege Novelty

For a claim of breach of implied contract or unjust enrichment based upon "the conveyance of an idea," it is required that the idea be novel. *Garrido v. Burger King Corp.*, 558 So. 2d 79, 84 (Fla. 3d DCA 1990); *Alevizos v. John D. and Catherine T. MacArthur Found.*, 764 So. 2d 8, 13 (Fla. 4th DCA 1999). An idea is not novel if it is "merely an innovative representation or adaption of existing knowledge" or a "variation on a theme." *Garrido*, 558 So. 2d at 84. An idea that is "within the public domain . . . can not constitute a protectible property right." *Id* It is not inequitable to use an idea that is in the public domain without paying for that idea. *Alevizos*, 764 So. 2d at 13.

7

BP argues that Plaintiff has not plausibly alleged the element of novelty for two reasons. First, BP argues that certain news articles show that all three of Plaintiff's ideas were publically disclosed before he allegedly submitted them to BP, and therefore, they were not novel.  Second, BP argues that Plaintiff failed to allege that two of his ideas were anything more than variations or adaptations of existing knowledge, and therefore Plaintiff has not alleged that they are novel ideas.  For the following reasons, the Court finds that Plaintiff has sufficiently alleged the element of novelty for each of his three ideas.

      **1.  BP's Argument that Plaintiff Failed to Allege Novelty Because His Ideas Were Publically Disclosed Before Their Alleged Submission to BP**

BP first claims that Plaintiff cannot plausibly allege the element of novelty for each of his three ideas because those ideas were publically disclosed before he allegedly submitted them to BP.  To support its claim, BP urges the Court to take judicial notice of certain exhibits attached to its motion, under Federal Rule of Evidence 201(b). These exhibits, Exhibits A–O, consist of thirteen articles from journals and news organizations, a media briefing transcript, and a transcript of a news report.  BP asserts that these articles establish when the ideas at issue in the instant case were reported or otherwise known in the public domain.  For example, BP argues that Plaintiff's "Top Hat" with thermal lifting idea was not novel because before Plaintiff's first alleged disclosure of the idea to BP on May 15, 2010, the idea was already publically discussed in Exhibits G, I, and D.

BP argues that the articles are the proper subject of judicial notice at the motion to dismiss stage because they are publically available materials from known media sources, and, given their number and consistency, they are not subject to reasonable dispute. BP further asserts that it does not matter whether the statements contained within the articles are true, as they are

offered only to show that the statements were publically made before Plaintiff's alleged submission of his ideas to BP.

BP cites to cases that supply two different bases upon which a court may rely when taking judicial notice of documents outside of the complaint on a motion to dismiss: (1) Federal Rule of Evidence 201(b); and (2) Federal Rule of Civil Procedure 10(c). For the following reasons, the Court declines to take judicial notice of the articles provided by BP.

### a. Whether the Court Should Take Judicial Notice under Federal Rule of Evidence 201(b)

Under Federal Rule of Evidence 201(b), a court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice may be taken by a court "at any stage of the proceeding." Fed. R. Evid. 201(d). A court "may take judicial notice on its own," or if a party requests that a court take judicial notice and supplies the court with the information, the court "must take judicial notice." Fed. R. Evid. 201(c)(1) and (c)(2).

In urging the Court to take judicial notice of the articles, BP relies on *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999).  In *Bryant*, the Eleventh Circuit held that a court may take judicial notice of relevant public documents "legally required by and publicly filed with the SEC at the motion to dismiss stage" under FRE 201(b).  *Id.* at 1276.  *Bryant* was a class action lawsuit brought by shareholders alleging that the defendant corporation's officers made "false and misleading statements and material omissions in order to inflate the value of the company's stock in violation of the Securities and Exchange Act of 1934."  *Id.* at 1273.  The defendant corporation attached the SEC documents to its motion to dismiss in order to provide support for two defenses: a "safe-harbor" protection under 15 U.S.C. § 78u-5 ("Reform Act")

9

and a similar, judicially-created defense known as the "bespeaks caution" doctrine. *Id.* at 1275–1276. The "safe-harbor" protection under the Reform Act prevents certain "forward-looking statements," as defined in the Act, from serving as a basis for liability in private securities fraud lawsuits. *Id.* at 1276 n. 7. Similarly, the "bespeaks caution" doctrine prevents "statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved" from providing a basis for liability. *Id.* The defendant corporation wanted to use the documents for the purpose of "determining what statements the documents contain[ed] and not to prove the truth of the documents' contents." *Id.* at 1278.

The court explained that allowing judicial notice of SEC filings in a securities fraud case was consistent with the aim of the Reform Act to allow dismissal of frivolous claims as early as feasible. *Id.* The court noted that, at the motion to dismiss stage, the prohibition on considering facts beyond those alleged in the complaint serves to protect parties from "being caught by surprise when documents outside the pleadings are presented at that early stage." *Id.* at 1279. The court then explained that allowing judicial notice of the SEC filings was not inconsistent with that policy because not only were the plaintiff shareholders aware of the SEC documents, they relied on the documents to form their misrepresentation and omission claims. *Id.* at 1277-79. The court further emphasized that the documents were only relevant to determine the statements contained therein, and for that purpose, there was little question as to the authenticity of the documents or the fact that they were actually filed. *Id.* at 1278. Notably, in reaching this conclusion the court "stress[ed] that [its] holding relate[d] to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings." *Id.* at 1277.

Unlike the SEC filings in *Bryant*, Exhibits A–O in the instant case are not "sources whose accuracy cannot reasonably be questioned" under FRE 201(b) with regard to the proposition that certain ideas, or proposals, for containing the oil spill were reported, or otherwise known in the public domain. Fed. R. Evid. 201(b).  Whereas in *Bryant* the SEC documents were judicially noticed for the sole purpose of determining what statements the documents contained, here the exhibits are sought to be introduced by BP to defeat the allegation that Plaintiff's ideas were novel.  *Bryant*, 187 F.3d at 1278.  Whether or not Plaintiff's ideas were novel is a fact that cannot "be accurately and readily determined" from those sources simply by judicial notice of the fact that the articles were published when they were. Fed. R. Evid. 201(b).

BP argues that it does not matter whether the statements contained in the articles are true, as merely the fact that the articles were published before Plaintiff's submission of his ideas to BP defeats the allegation that such ideas were novel.  However, if these articles are considered only to determine what statements the documents contain—not the truth of those statements—it still cannot be determined at this stage whether those statements were in fact descriptions of Plaintiff's ideas.  For example, it is not clear whether Plaintiff's "Top Hat" with thermal lifting idea is the same as the idea discussed in the May 7, 2010 article found at Exhibit D, which reported that BP was planning to use "a pipe within a pipe," within a "containment structure," and "pipe warm water from the surface into the outer pipe to prevent formation of gas hydrates." In other words, at this stage, there is a reasonable dispute concerning whether the statements contained in the articles were public disclosures of Plaintiff's ideas.  Therefore, in ruling on the motion to dismiss, the Court cannot use FRE 201(b) to look beyond the four corners of the Complaint in order to take judicial notice of Exhibits A–O.

**b.   Whether the Court Should Take Judicial Notice under Federal Rule of Civil Procedure 10(c)**

BP also relies on *In re Towne Services, Inc. Securities Litigation*, 184 F. Supp. 2d 1308 (N.D. Ga. 2001).  *In re Towne Services, Inc.* involved a class action by plaintiffs who were shareholders in the defendant corporation. *Id.* at 1311. The plaintiffs alleged that the corporation and its officers made certain omissions and misrepresentations regarding its earnings during a public offering, which amounted to securities fraud.  *Id.* at 1312.  The defendants moved to dismiss the case and in doing so, submitted and relied upon SEC filings, news articles, and press releases.  *Id.*  The court took judicial notice of the SEC filings, basing its reasoning upon *Bryant* and FRE 201(b). *Id.*

The court then went on to consider the news articles and press releases that were relied upon in the motion to dismiss. *Id.* The court noted that *Bryant* "left open the issue of whether, or to what extent, such documents may be the subject of judicial notice on a motion to dismiss." *Id.* at 1313 (citing *Bryant*, 187 F.3d at 1280 n. 16). The *Bryant* court explained that the rule is based upon Federal Rule of Civil Procedure 10(c), and the

> rationale is that when a plaintiff files a complaint based on a document but fails to attach that document to the complaint, the defendant may so attach the document, and therefore, the document, as one that . . . in fairness should have been attached to the complaint, is considered part of the pleadings . . . . In short, the theory is that such a document is not "outside the pleadings," and thus it may be considered at the 12(b)(6) stage . . . .

*Bryant*, 187 F.3d at 1280 n. 16. The *In re Towne Services, Inc.* court went on to explain that there is support in case law "for considering evidence outside the pleadings in connection with a motion to dismiss *if the evidence is specifically relied upon in the complaint and its contents are not in dispute*." *Id.* (emphasis added). The court emphasized that the news articles and press releases were "referred to or relied upon in the plaintiffs' complaint," and in such a case, when

12

the contents of the documents are not in dispute, judicial notice is proper. *Id.* The court took

judicial notice of the documents only "to the extent they establish[ed] the content of the

statements attributed to the defendants, but not for any other purpose." *Id.*

In order for a court to take judicial notice of articles at the motion to dismiss stage using

the reasoning mentioned in *Bryant*, and relied upon in *In re Towne Services, Inc.*, the articles

need to be "specifically relied upon in the complaint" and the contents of the articles could not

be in dispute. *Id.* Here the articles relied upon by BP are neither mentioned nor relied upon in

Plaintiff's complaint. The articles are not central to Plaintiff's claims and would not be necessary

for him to prevail on his claims. In addition, Plaintiff disputes that the articles contain public

disclosures of his ideas, as he states that each article was either published after his submission or

does not even relate to his ideas. Therefore, the Court declines to use Federal Rule of Civil

Procedure 10(c), along with relevant case law, to take judicial notice of the articles provided by

BP with its motion to dismiss.[1]

### 2.   BP's Argument That Plaintiff Failed to Allege Novelty Because His Ideas Were Variations or Adaptations of Existing Knowledge

BP asserts that Plaintiff failed to allege that two of his ideas, the insertion pipe idea and

the "Top Hat" with thermal lifting idea, were anything more than variations or adaptations of

existing knowledge, and therefore Plaintiff has not alleged that they were novel ideas. As to

---

[1] BP also relies on *Rolling v. Crosby*, 438 F.3d 1296 (11th Cir. 2006). *Rolling* is a habeas case in which the court considered whether the defendant's attorneys deprived him of effective assistance of counsel by failing to move for a change of venue soon enough, and then by failing to adequately support the motion. *Id.* at 1298. The trial court took judicial notice of extensive pretrial publicity attached to the motion to change venue, including newspaper articles, radio transcripts, and television transcripts. *Id.* The trial court evaluated "the extent and nature of any pretrial publicity" in order to determine whether a change of venue was necessary to secure a fair trial, due to prejudice against the defendant in the county. *Rolling v. State*, 695 So. 2d 278, 284–285 (Fla. 1997). Here, BP is requesting that the Court take judicial notice to defeat Plaintiff's common law claims of breach of implied contract and unjust enrichment. Accordingly, the basis for judicial notice in *Rolling* is distinguishable and does not support BP's request.

Plaintiff's insertion pipe idea, BP argues that it is merely a variation or adaption of BP's existing

Riser Insertion Tube Tool ("RITT") idea.  Plaintiff responds that RITT was merely the name that

BP gave to Plaintiff's insertion pipe idea.  As to Plaintiff's "Top Hat" with thermal lifting idea,

BP argues that it is merely a variation or adaption of BP's existing "Top Hat" idea.  Plaintiff

responds that his "Top Hat" with thermal lifting idea is distinguishable from BP's idea because

of its purpose, which is to increase the oil flow rate to maximize the collection of oil.

An idea is not novel if it is "merely an innovative representation or adaption of existing

knowledge" or a "variation on a theme."  *Garrido*, 558 So. 2d at 84.  Here, Plaintiff repeatedly

alleges that he "conceived, invented, and designed" ideas that were "novel, unique, and

concrete."  These allegations, among others, are sufficient at this stage to show that his ideas

were more than variations or adaptations of existing knowledge.  To decide whether Plaintiff

ideas were more than variations or adaptations of existing knowledge requires the Court to

examine facts that are beyond the scope of this motion.  Accordingly, the issue is more

appropriately determined at the summary judgment stage or at trial.

### B.  BP's Arguments that Plaintiff Failed to Allege Disclosure

Finally, BP argues that Plaintiff did not allege that he disclosed two of his ideas to BP—

the "Top Hat" with thermal lifting idea and the riser spool and two-pin flange alignment idea—

and, therefore Plaintiff's claims must fail.  As to the "Top Hat" with thermal lifting idea, BP

points out that Plaintiff merely alleged that he suggested the idea of thermal lifting in emails to

Hittos, which is insufficient to show that the idea was submitted to BP.  Plaintiff responds that he

was led to believe, and did believe, that Hittos had authority to receive messages from and

transmit messages to BP.  He further asserts that BP, directly and indirectly through Hittos,

14

requested the use of Plaintiff's ideas and his ongoing engineering services, and knowingly and voluntarily accepted their substantial benefits.

As to the riser spool and two-pin flange alignment idea, BP argues that Plaintiff's allegations are inadequate because he merely alleged that he disclosed the idea to BP at some point between May 19, 2010, and July of 2010, without specifying when or how he did so.  In response, Plaintiff reiterates that from May 19, 2010, to July of 2010, he worked with Hittos, HST, BP, and Professor Robert Bea to develop a viable "remove the riser" plan.

In the Complaint, Plaintiff alleges that BP requested the use of his ideas and his ongoing engineering services "both directly and indirectly via Attorney Elizabeth Hittos."  He alleges that he "was led to believe, and did believe, that Attorney Hittos had authority to receive and transmit messages to [BP]."  He alleges that BP knowingly and voluntarily accepted the benefit of his ideas and services with the understanding and expectation that it would compensate Plaintiff for their use.  He furthermore alleges that he worked with Hittos, HST, BP, and Professor Bea to develop a plan and design for the riser spool and two-pin flange alignment idea.  These allegations, accepted as true, are sufficient to allege that Plaintiff disclosed his ideas to BP, in order to withstand the motion to dismiss. Whether Plaintiff can prevail on these claims is more appropriately determined at the summary judgment stage or at trial.

## IV.    Conclusion

The Court declines to take judicial notice of Exhibits A–O that were attached to BP's Motion to Dismiss.  The Court concludes that Plaintiff has sufficiently stated his six claims for relief against BP.  It is **ORDERED AND ADJUDGED** that BP's Motion to Dismiss (Dkt. 18) is therefore **DENIED**.

Additionally, BP's Motion to Stay Discovery Pending Resolution of the motion to dismiss (Dkt. 19) is **DENIED AS MOOT**.  The Court shall proceed to enter a case management and scheduling order.

**DONE AND ORDERED** at Tampa, Florida this 9th day of October, 2012.

SUSAN C. BUCKLEW
United States District Judge

Copies to:

Counsel of record