**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JOSEPH F. KAMINSKI,

               Plaintiff,

                                       Case No. 8:12-cv-826-T-24-MAP

v.

BP EXPLORATION & PRODUCTION INC.
and BP AMERICA PRODUCTION CO.,

               Defendants.
_____/

## <u>ORDER</u>

      This cause comes before the Court on a Motion for Summary Judgment filed by Defendants BP Exploration & Production Inc. and BP America Production Co., [Doc. 39], which Plaintiff Joseph F. Kaminski opposes, [Doc. 40]. Defendants filed a reply. [Doc. 48]. For the reasons stated below, Defendants' motion for summary judgment is granted.

**I.**      **BACKGROUND**

      Plaintiff Joseph F. Kaminski claims that, in the months following the April 2010 drilling rig explosion and resulting oil spill in the Gulf of Mexico, he gave three ideas for stopping the oil leak to Defendants BP Exploration & Production Inc. and BP America Production Co. ("BP") through a series of submissions. Plaintiff believes that BP used all three ideas, that each one helped BP's response efforts, and that BP now owes him millions of dollars.

      After highlighting the events and information surrounding the Deepwater Horizon incident, the Court summarizes the facts surrounding Plaintiff's three ideas and their related communications. Because each idea more or less has its own timeline and set of facts, the background summary is organized accordingly.

A.      **The Deepwater Horizon Incident**

The *Deepwater Horizon* was a drilling rig on the surface of the Gulf of Mexico that had been operating on the "Macondo" well in April 2010.  Figure A is a basic illustration of the equipment used in the drilling operation:



Generally, a drilling rig supports a riser, which is a long steel pipe connecting the rig to a blowout preventer stack ("BOP stack") that sits on the top of the well in the seafloor.  Inside the riser is the drill pipe, which runs from the rig, through the riser, through the BOP stack, and then down into the well.  The BOP stack is a line of defense for preventing well blowouts.  The BOP stack's lower portion is the blowout preventer, which has several mechanisms for sealing the drill pipe or completely shutting in a well; the upper portion is the lower marine riser package ("LMRP"), which also has devices for sealing the drill pipe or well.

On April 20, 2010, an explosion occurred on the *Deepwater Horizon*.  Two days later, the rig sank; the riser broke off from the rig and fell to the seafloor.  Oil began leaking from the broken riser.

B.      **Deepwater Horizon Response Efforts**

A team of BP, government, and third-party engineers formed to develop plans for different containment efforts, including plans to collect oil from the broken riser.  [Doc. 39, Ex.

D].  The response effort involved different response teams working on multiple solutions.  [Doc. 39, Exs. B, D].

On April 23, 2010, the Unified Area Command ("**UAC**")—an organization that included members from the United States Coast Guard, BP, and others—was created to oversee the management of the oil spill.  [Doc. 39, Ex. B].  The UAC had authority to set overall strategy and priorities, allocate critical resources, and ensure that objectives were met and strategies followed.  [*Id.*].

In late April 2010, the Alternative Response Technology ("**ART**") program was created under the direction of the UAC to process and review ideas submitted by the general public via designated websites, emails, and calls.  [Doc. 39, Exs. I-K].  Submissions from the public were entered into the ART database for review.  [Doc. 39, Ex. I at ¶ 9].  Similarly, if a member of Congress contacted a BP employee or contractor to request that a constituent's submission be reviewed, the BP representative would send the submission to be entered in the ART database and to be reviewed under the ART procedures.  [*Id.* at ¶¶ 9, 14].  The BP representative would also inform Congressional members that their constituents should submit their ideas through a designated website.  [*Id.* at ¶ 14].

The ART review process involved four stages, with the idea contributor being updated at each stage.  [Doc. 39, Ex. I at ¶ 6, Ex. K at 3-5].  At the first stage of ART review, engineers— BP employees or contractors who were not members of the Deepwater Horizon response teams that would ultimately consider ideas for potential use—conducted a preliminary evaluation by screening submissions for various criteria, such as feasibility, utility, and novelty.  [Doc. 39, Ex. I at ¶¶ 8-12].  If a submission was not feasible, not possible, or previously considered, it would not proceed to the next stage for further consideration and the submitter would be sent a

notification email.  [*Id*. at ¶ 8; Doc. 39, Ex. K at 4].   However, if a submission passed the preliminary evaluation at the first stage, it would be reviewed further at the second and third stages by a more senior team of engineers on the ART team.  [Doc. 39, Ex. I at ¶ 10].  At stage four, the idea would undergo additional review and field testing.  [*Id*.]

Only idea submissions that survived the four-stage vetting process were provided to the response teams for consideration for potential use in the response efforts.  [*Id*.].  A number of ideas survived the ART process and were used in response operations; these submissions were publicly acknowledged.  [*Id*. at ¶ 15; Doc. 39, Ex. J].

### C.    Plaintiff's Insertion Pipe Idea

Plaintiff's complaint alleges that his "insertion pipe idea [was] to insert a smaller pipe into the broken [riser] pipe past the break and inflate sealing rings" and that "it is imperative that BP add lines to pull the insertion pipe in and hold it in place" ("**insertion pipe idea**").  [Doc. 2 at ¶¶ 86-88].   Plaintiff contends that the Riser Insertion Tube Tool ("RITT") ultimately implemented by BP was in fact his insertion pipe idea.  [*Id*. at ¶ 61].

### 1.    Tuesday, May 11, 2010

On May 11, 2010, at approximately 10:00 p.m. EST, BP submitted a document, titled "Flow Containment and Capture Recovery System: Tophat and Riser Insertion Tube Tool Option," to the Unified Area Command ("RITT Procedure") for approval.  [Doc. 40, Exs. DD, FF].  The RITT Procedure accurately describes the RITT that was used in the Deepwater Horizon response.  [Doc. 40, Ex. DD].

On May 11, 2010, at 10:24 p.m., Plaintiff called the "BP Help Hotline" to propose his insertion pipe idea.  [Doc. 2 at ¶¶ 11, 38; Pl. Depo. Tr., Doc. 52-2, 119:03-07].   The call representative requested Plaintiff's email address in order to forward him a form to fill out.

[Doc. 2 at ¶¶ 11, 38].  This call lasted about six minutes.  [Pl. Depo. Tr., Doc. 52-2, 107:24–108:07].

A few minutes later, at 10:33 p.m., the Horizon Support Team ("**HST**") sent Plaintiff an email, which attached a form titled "Alternative Response Technology Short Form_distributed.pdf" ("**ART form**"), and stated:

> We appreciate your concern and willingness to help. Please complete the form attached to this email with as much detail as possible, and return it to the email address [Horizonsupport@oegllc.com][.] This will allow us to quickly and accurately collect your information so that we can forward it to the appropriate technical reviewer. Once your information has been analyzed, we will contact you with the result of the review. Please note we are receiving thousands of potential solutions from the public and it may take some time for us to get back with you. We are currently implementing multiple tactics to both control the source of the leak and the resulting spill. Once you return this form, you do not need to contact us again.

[Doc. 39, Ex. M].

## 2.	Wednesday, May 12, 2010

On May 12, 2010, at 2:49 p.m., Plaintiff submitted a completed ART form describing the insertion pipe idea that he had discussed on his prior phone call.  [Doc. 2, ¶¶ 40, 86; Doc. 39, Ex. N].  The "brief description of technology" field stated, in part:

> Using a custom designed Kevlar inflatable Pipe stop Balloon, and a rigged but flexible snake system. First need to cut the main pipe post of the largest breach to gain clear entry to pipe. With the inflatable pipe stop at the end of the snake system, snake the pipe stop inflatable device into the pipe at a point before the main break. Inflate the balloon to seal the pipe. More than one inflatable device can be at the end of the pipe to give any amount of blocking force desired. . . .

[Doc. 39, Ex. N].  The "expertise required / expertise offered" field stated, in part:

> I am a former NASA scientist/technical director. I am also My expertise is [sic] in many areas, Electrical, Electronic, Mechanical, electromechanical. I am a recognized expert in the area of failures of all types. I have at least three possible solutions to this problem. However, I NEED more data. Bring me to your site, give me access to all your data. I will have a 100% doable solution in a matter of 2 days.  Call Jack Welch and ask him who saved GE1, Call Austin Carroll at the

> pentagon and ask him who is the smartest guy he ever met.  I will resolve this, that I guarantee.  Bring me IN on this, Give me data and authority and I WILL bring it to closure . . . .

[Doc. 39, Ex. N].  A few hours later, at 7:19 p.m., Plaintiff received an email from HST notifying him that his idea submission was reviewed but had been determined to be inapplicable ("**first rejection email**"):

> Thank you so much for taking the time to think about and submit your proposed solution regarding the Horizon incident.  Your submission has been reviewed for its technical merits.  Unfortunately, the team has determined that your idea cannot be applied under the very challenging and specific operating conditions we face. All of us on the Horizon Support Team appreciate your thoughts and efforts.

[Doc. 40, Ex. K].

### 3.   Thursday, May 13, 2010

#### a.   Second rejection email from HST

On May 13, 2010, at 12:46 a.m., Plaintiff replied to the first rejection email, which included the following excerpts:

> I have been trying to help you, with no success. The good news is that my gas expandable compression fit sealing technique for a smaller pipe inserted into you [sic] main pipe will work even if you have to insert it vertically into the severed well head directly into the well casing. It is a simple design and can be fabricated even here in tampabay [sic] and shipped to you. The total pipe would consist of a smaller pipe about 2/3 dia size of the pipe it goes into and at least ten to 20 feet long. One end has a safety valve that is wide open, during installation, allowing oil flow thru it and reducing well force against inserting the pipe. The inserted end of the smaller pipe has three doughnut shaped (Orings) sealing rings ( each [sic] 1 foot wide, and two feet appart [sic]) on the outside of the pipe, hard point attached to the smaller pipe. They are gas expandable (Oring) bags with anti slip rubber coating. They are deflated when the pipe is inserted. Once the pipe is inserted the three sealing rings are expanded with gas pressurization forming a High compression fitting on the inside of the larger pipe. Now oil flow is established thru the smaller pipe and the saftey [sic] valve can be close [sic]. . . .

> Please take this under advisement. Especially when the new little top hat fails tomorrow for all the reasons I stated. This will work and it is far easier than the 100 ton top hat. It will also be great for your image in this whole thing. When My son and I become paid hero's [sic] for the idea and helping you from here in

tampabay [sic] florida. I will say it was BP's willingness to work and find the right solution from anyone anywhere for this very unique problem. You will also pay me and my son at least 2 million for the idea and my personal help to gaurantee [sic] its succes [sic]. Making hero's [sic] who will only speak highly of you will help your recovery in all this. This is the right thing to do technically and morally and publically. There is just no way it can't be done faster than the top hat and this will work. Good news is there will be only 100% containment of the oil the seond [sic] it is installed, far above the best estimates for your top hat.

[Doc. 40, Ex. K]. A few hours later, at 8:13 a.m., Plaintiff received an email that was identical to the first rejection email ("**second rejection email**"). [Doc. 39, Ex. P].

### b. *Call from Elizabeth Hittos*

Sometime during the morning of May 13, 2010, Plaintiff also sent a communication to the website of his district's congressman, U.S. Congressman Gus Bilirakis, to complain that BP was automatically rejecting his submissions. [Pl. Depo. Tr., Doc. 52-2, 176:7-10; 76:6-22]. Around 1:30 p.m., Plaintiff received a call from Congressman Bilirakis's staff member, Elizabeth Hittos. [Pl. Depo. Tr., Doc. 52-2, 211:18-22].

At that time, Hittos's position was legislative counsel, and her duties generally involved advising Congressman Bilirakis on pending bills, drafting legislation, and preparing memoranda relating to issue areas that were assigned to her. [Hittos Depo. Tr., Doc. 52-1, 8:1-21]. One of her areas was energy and commerce issues, which included oil drilling. [*Id.*]. After the Deepwater Horizon incident, Congressman Bilirakis's office helped facilitate ideas that constituents wanted to pass along to BP. [*Id.* at 9:24-10:1].

During his call with Hittos, Plaintiff began explaining his insertion pipe idea and, after a few minutes, Hittos said that she would call him back after getting a "three-way going." [Doc. 2 at ¶ 44; Pl. Depo. Tr., Doc. 52-2, 189:12-13]. A few minutes later, Hittos called Plaintiff back. [Pl. Depo. Tr., Doc. 52-2, 189:12-13].

At this point, Plaintiff believed he was on a conference call with Hittos and BP representatives, during which BP representatives conveyed questions about Plaintiff's insertion pipe idea to Hittos, who would relay the questions to Plaintiff.  [*Id*. at 176:24-180:13].  Plaintiff contends he answered the questions and explained: (1) where to get inflatable seals; (2) readily-available flap seals could be used in lieu of inflatable seals; and (3) at least three, maybe five, seals would be needed.  [Doc. 2, ¶ 44; Pl. Depo. Tr., Doc. 52-2, 204:5-207:1].

Plaintiff believes that the conference call with Hittos and the BP representatives lasted about twenty minutes, after which the BP representatives disconnected and Hittos remained on the phone with Plaintiff.  [Pl. Depo. Tr., Doc. 52-2, 210:3-18, 211:18-22].  Plaintiff told Hittos that his prior email to HST stated that he wanted two million dollars, and Hittos asked him to forward her the emails that he had sent to HST.  [*Id*. at 210:15-18].

### c. Email to HST

Soon after ending his call with Hittos, Plaintiff heard a press release or an announcement on the radio that BP had decided on a "recent new proposal."[1]  [Doc. 2 at ¶¶ 48-49; Pl. Depo. Tr., Doc. 52-2, 213:18-214:11; 216:20-218:1].  Based on this press release, Plaintiff believed that BP had decided to use and accepted his insertion pipe idea.  [Doc. 2 at ¶ 49; Pl. Depo. Tr., Doc. 52-2, 221:6-10].  At 2:48 p.m., Plaintiff emailed HST, stating he had just seen a press release that BP was evaluating his idea:

> I have just seen the press releaseYour [sic] executive has decided to hold off on the top hat method. He has also stated you are evaluating MY IDEA sent to you to insert a pipe into the larger pipe. This is important. If you want it to work you

---

[1] In his complaint, Plaintiff alleges that an MSNBC article (titled "BP to try Tube, Not 'Top Hat,' in Gulf Gusher") reported that BP had issued a press release—on May 13, 2010, at approximately 3:00 p.m.—in which BP announced that it had decided on a "recent new proposal" to siphon the oil on the surface to a tanker using a small tube surrounded by a stopper and threaded into the jagged pipe gushing oil from the seafloor.   [Doc. 2 at ¶¶ 48, 49].   In his deposition, Plaintiff acknowledged that it is not possible that his 2:48 p.m. email could reference a 3:00 p.m. press release.  [Pl. Depo. Tr., Doc. 52-2, 212:16-20].   Plaintiff testified that his 2:48 p.m. email's reference to a press release was instead the radio announcement that Plaintiff heard sometime after his conference call with BP representatives and Hittos and before his 2:48 p.m. email.  [*Id*. at 212:22-218:9].

need to have me explain to you how it is to work. I have identifed [sic] exhisting [sic] materials off the shelf that can be used to make the insertion pipe and I have also identified possible sorces [sic] of the Expandable sealing rings that would be used on the outside of the insertion pipe. The pressure studies your [sic] doing are good and will help determine the number of sealing rings that will be needed. But there is just no way anyone at you [sic] company can determine exactly how this pipe is to work and how I planned to implement it based on the limited information I gave you.

[Doc. 39, Ex. P; Pl. Depo. Tr., Doc. 52-2, 215:2-216:19].  Stating that BP needed him to explain how his idea would work, Plaintiff requested that BP allow him to help.  [Doc. 39, Ex. P].

### d.  Emails to Hittos

At 3:01 p.m., Plaintiff forwarded to Hittos the email that he had sent HST earlier that day at 12:46 a.m. and a copy of the ART form.  [Doc. 2, ¶ 50; Doc. 40, Ex. K].  At 3:23 p.m. and 4:40 p.m., Plaintiff emailed her additional information regarding his insertion pipe idea.  [Doc. 40, Ex. K].

At 5:29 p.m., Plaintiff sent Hittos an email stating that BP was "trying to exclude [him] on [his] idea and [was] also making a mistake," and that Plaintiff had "no information of the detail design of what they are doing [and] [t]here is no way to know without it if what they are planning will work."  [Doc. 2 at ¶ 56; Doc. 39, Ex. Y].  At 7:56 p.m., Plaintiff emailed her again; Plaintiff alleges this email "makes it clear that BP need[ed] to have the lines on the insertion pipe in order to pull the insertion pipe in and hold it in."  [Doc. 2 at ¶ 58; Doc. 40, Ex. K].

### 4.    Friday, May 14, 2010

On May 14, 2010, at 3:10 p.m., Plaintiff received an email from HST that was identical to the first and second rejection emails ("**third rejection email**").  [Doc. 40, Ex. K].  At 4:34 p.m., Plaintiff forwarded HST's third rejection email to Hittos.  [*Id*.].

At 10:43 p.m., Hittos emailed Plaintiff, stating: "I'd like to forward you a slide show of BP's plan. Take a look and specifically tell me where they are going wrong. I would like to point

9

out their inherent mistakes in our next conference call."  [Doc. 40, Ex. K].  Hittos testified that

"if a constituent claim[ed] to have expertise in any particular area[,] [she] would often times

forward them material and ask for . . . their opinion."  [Doc. 52-1, 24:24-25:12].

At 10:45 p.m., Hittos forwarded Plaintiff an email that she had received from Brian

Miller—a congressional liaison for BP that was working with congressional staffers—regarding

the "Gulf of Mexico Oil Spill Response Update" from "05/14/2010 – 3:00pm EST." [2]  [Doc. 39,

Ex. C; Hittos Depo. Tr., Doc. 52-1, 27:10-12].   The update stated the following about the RITT

operation:

> A tool has been fabricated and lowered to the sea floor.  One end will be attached
> to the riser and drill pipe which run to the . . . surface. The other end will be
> inserted into the ruptured riser pipe that is the primary source of the leak.  All
> necessary equipment is on location and engineers plan to move them into place
> Friday night.

[Doc. 39, Ex. C].  Plaintiff alleges that this RITT was his insertion pipe idea.  [Doc. 2 at ¶ 61].

### 5.      Saturday, May 15, 2010

On May 15, 2010, at 12:16 a.m., Plaintiff emailed his answers in response to Hittos' May

14th email.  [Doc. 2 at ¶ 62].   Later that morning, at 2:50 a.m., Plaintiff sent another email to

Hittos, which attached drawings and stated in part:

> Elizabeth, They have seen fit to modify my method of the smaller pipe, and not
> had the ethics to even give me credit.  But still even with their modification I
> think they need to make some changes.  The two pictures I drew show what I was
> saying about using the top hats as strain line anchors, and a pic [sic] to show how
> I feel they should control the redirection of Oil [sic] flow once inserted.

[Doc. 39, Ex. KK].  Plaintiff alleges that the email reiterated "that it is imperative that BP add

lines to pull the insertion pipe in and hold it in place."  [Doc. 2 at ¶ 64].

---

[2] Hittos would "get information from [Brian Miller], pass it along to the Congressman and/or to constituents" and
"also, send him information so that he could get that to BP and the Unified Command, as it relates to constituent
ideas and whatnot."  [Hittos Depo. Tr., Doc. 52-1, 27:10-23].  Hittos further testified that this update was likely one
of the daily updates she received regarding progress made in stopping the leak. [*Id*. at 26:6-9].

6.      **Sunday, May 16, 2010**

At 12:54 p.m., Hittos sent an email to Plaintiff, forwarding a May 16, 2010 update, titled

"Update on Riser Insertion Tube Tool progress,"[3] which provided, in part, that: (1) the RITT was

successfully inserted overnight and had captured some oil and gas that was then stored in a

tanker; and (2) the RITT was fashioned from a four-inch pipe, and then a five-foot length of the

specifically-designed tool was inserted into the end of the damaged riser from where the oil was

leaking.  [Doc. 40, Ex. K].  Hittos testified that she forwarded the update to Plaintiff, because "it

was just great news, because apparently they were making some progress with stopping the

leak."  [Hittos Depo. Tr., Doc. 52-1, 80:3-4].

D.      **Top Hat With Thermal Lifting Action Idea**

Plaintiff alleges that he submitted an idea to modify the "top hat" by injecting warm

upper seawater into the top hat to create a thermal lifting action ("**top hat with thermal lifting**

**action idea**"), [Doc. 2 at ¶ 66], and that BP modified all top hats as he suggested.  [*Id*. at ¶ 74].

1.      **Saturday, May 15, 2010**

On May 15, 2010, at 5:30 p.m, Plaintiff emailed Hittos regarding his idea to place a top

hat over the insertion pipe:

> I understand they expect even with the small pipe method, that the seal will leak
> and a loss of about 5% will remain.  Good news, I'm confident there is a way to
> collect that too.  It would involve making another "Top hat" this one would have
> two additional slits in it to allow for dropping down over the junction of the small
> pipe and the large pipe, and the strain line that should be going to the Old top hats
> as anchors.

[Doc. 40, Ex. K; Pl. Depo. Tr., Doc. 52-2, 245:14-250:20].

---

[3] The update was sent from the email, deepwaterhorizonresponse@hotmail.com, which is the address that would
send Hittos received daily or weekly updates regarding the status of the response efforts.  [Hittos Depo. Tr., Doc.
52-1, 79:14-19].

At 8:11 p.m., Plaintiff emailed Hittos to suggest injecting warm upper seawater into the top hat—which would be placed over the RITT, not the LMRP—to create a thermal lifting action.   [Doc. 40, Ex. K; Doc. 52-2, 251:1-252:9, 261:23-263:11].[4]   Plaintiff's email also included a drawing of the mechanism.  [Doc. 40, Ex. K].  Plaintiff alleges that his idea was a "modification to the 'Top Hat' . . . which would allow BP to collect the oil which leaks from the insertion pipe."  [Doc. 2 at ¶ 66].

At 9:22 p.m., Hittos emailed Plaintiff, stating "Instead of meeting at 10am next Friday, [May 21, 2010,] let's meet at 230pm. I can then let you listen in to the 300pm conference call with the unified command."  [Doc. 2 at ¶ 67; Doc. 40, Ex. K].  Plaintiff testified that he never listened in on that conference call; he believed that because the insertion pipe was working, the conference call was no longer necessary.  [Doc. 52-2, 257:10-258:4].

### 2.   Monday, May 17, 2010

Plaintiff's complaint alleges that, at some time on May 17, 2010, he saw a press release. [Doc. 2 at ¶ 74].   Based on this, Plaintiff allegedly knew that BP had used "precisely the modification suggested by [him] on May 15, 2010."  [*Id.*].  On May 17, 2010, at 11:03 a.m., Hittos emailed Plaintiff, stating:

> Joseph-As you know, I have alerted the Unified Command specifically about your ideas.  I urge them on every conference call to listen to constituents who have knowledge and expertise to assist in the disaster.  Further, I have invited you to meet with me this Friday.  I hope you realize that Congressman Bilirakis is just as distressed as you are. . . . I read every email you send with interest, but cannot respond to each of them because others have written or called in with their advice

---

[4] The email states, in part: "Elizabeth: This is a pic of a good method to capture the oil that will leak from the seal. It is estimated at 5%. . . . This is where the initital [sic] setting on the pumps comes from I give. also, [sic] the new top hat does not need to weigh tons or be made oyut [sic] of concrete.  It can be made from plate steel with footings to prevent oiut [sic] from sinking in to the mud. . [sic] The goal is to set it over the junction of the two pipes, the larger riser, and the small inserted pipe. . . . In this case warm sea water from the surface will be pumped into the lower section of the box and promote rising of the oil, as well as keep the temps [sic] out of the freezing zone inside the box.  Warm Water [sic] is injected from the surface into the inlet port at the same rate as it is extracted from the top outlet port. [sic] creating a thermal and specific gravity rise balance inside the box." [*Id.*]

and tips also.  I'm still very happy to meet with you on Friday.  Let me know if you still want to meet. Thanks.

[Doc. 40, Ex. K].

### 3.      Saturday, May 22, 2010

On May 22, 2010, BP submitted a document, titled "Flow Containment and Capture Recovery System: Top Hat Over Horizon LMRP" ("LMRP Top Hat Procedure") for approval. This document shows the processes and equipment for the LMRP Top Hat to be deployed at the end of the Deepwater Horizon riser, and accurately describes the LMRP Top Hat that was used in the Deepwater Horizon response.  [Doc. 39, Exs. DD, F].  The LMRP Top Hat Procedure was approved on May 25, 2010 and May 26, 2010.  [*Id.*].

### E.      Riser Spool and Two-Pin Design Idea: May 19, 2010 to July 2010

Plaintiff's complaint alleges that from May 19, 2010 through July 2010, he worked "to develop a viable 'remove the riser' plan that would allow for the installation of a BOP on top," which involved: (1) "devis[ing] a stint pipe, later called the 'Riser Spool' by BP;" (2) providing plans "to cradle the old riser pipe with surface ship lines and steer it away as it is cut off, blown off, or unbolted;" and (3) providing plans for installing two pins "(one long & one short) in the riser spool to allow it to be mated to the old riser pipe adapter plate" ("**riser spool and two-pin design idea**").  [Doc. 2 at ¶ 77].  Plaintiff contends BP's "capping stack" mechanism used his riser spool and two-pin design idea.  [*Id.* at ¶ 110].

Plaintiff testified that he emailed Hittos, on May 19, 2010 at 9:29 a.m., about his riser spool and two-pin design idea.  [Pl. Depo. Tr., Doc. 52-2, 269:18-270:24].  On May 24, 2010, Plaintiff made the following submission for ART review:

Remove the riser. Remove and replace one at a ime [sic] the riser bolts. Install NASA explosve [sic] bolts used on Shuttle SRB release. Designed for more volitile [sic] environment than this. RIG bolts for simultaneous fire. ANchore

13

[sic] ship top side, 1000 yrds port of riser. Lower a strian [sic] line to riser and attach. There should be 25% of riser weight taken up by line at about 60deg angle. This will formthe [sic] guide method to guide the rise [sic] in the fall to a safe distance. Prepare a Replacement 21" pipe section (5-10 feet long. [sic] Fitted with a chokevalve and a shear ram in sequence, and a mating flange to the riser. Lower the rigging to 4000 feet above the riser in ready. Fire the bolts. The riser will lift slightly and then gracefully slide to the side guided by the strain line from above. Resting about 200-300 yards to port. Begine [sic] to lower the new riser section. it should be set to open bores on valves as to not restrict lowering. The assembly can be prefitted with a connection to top side oil capture. Just as Insertion pipe was. The output of the well will NOT be a strong directed flow and it is toyour [sic] advantage. Hydrostaic [sic] force will break up the flow as it leave [sic] the BOP, just as it does now on the riser. Lower the new unit and bolt in place. Initially clamps may be used. If there is a concern of alignment, please call me, I can show how to remove that possibility completly [sic].

[Doc. 39, Ex. R].  On June 12, 2010, Plaintiff made another ART submission:

I submitted this plans [sic] almost a month ago, it was modified to something less effective, I dont know why.. [sic] Cut the riser flange bolt heads and release the riseer [sic] from the LMRP adaptor plate. the [sic] remaining studs will unsreww [sic] easy, there will be no torque on them. Place a pipe fitted with the correct flange to mate to that LMRP. Install a choke valve on assembly so the well flow can be minimized reducing containment issues on surface.

[Doc. 39, Ex. S].  Plaintiff received emails from HST on June 16, 2010 and June 24, 2010, respectively notifying him that his idea could not be applied and that a similar approach had already been considered.  [Doc. 39, Exs. T, U].

### F.    Email From Hittos to BP: May 25, 2010

On May 25, 2010, Hittos emailed Brian Miller regarding Plaintiff, stating that "we have a retired NASA scientist/engineer who lives in our district and has been in constant communication with me since the explosion of the Deepwater Horizon" and that:

While he has emailed the Deepwater Horizon response website, he feels his ideas to plug up the leak have been given the short shrift.  Is there any one person at the Unified Command I can direct him (or at least his emails to) for the purpose of a comprehensive evaluation of his ideas/sketches to plug up the leak? I know every Tom, Dick, and Harry out there has offered solutions to clean up the spill from the absurd to the sublime, but I have a sense this guy might be on to something to the

exclusion of all other constituent contact I've had regarding the oil spill. Any direction you could offer me would be appreciated.

[Doc. 40, Ex. K]. Hittos received the following response:

Elizabeth, the portal link below [www.horizonedocs.com/index/html] is probably the best we can do at this time. You can tell your constituent, however, that some of the ideas that have come in through this portal have been adopted and are informing the engineering effort. As you might expect, many have not panned out upon rigorous scrutiny but the portal is not a black hole for ideas that are never reviewed. They are reviewed and considered. Let us know if this is not satisfactory.

[*Id*.]. Hittos replied, "Will do. I'll encourage him to click on the below link although that's been my mantra for weeks." [*Id*.]. At 3:46 p.m., she forwarded BP's responses to Plaintiff. [*Id*.].

Hittos testified that when she received idea submissions from constituents, she would have likely have directed them to the Deepwater Horizon response website. [Hittos Depo. Tr., Doc. 52-1, 63:9-25, 72:18-75:22]. She also would have likely forwarded their ideas to an email address that BP had set up for congressional staffers, or if more personalized, to Brian Miller. [*Id*. at 54:13-21; 57:12-15, 63:9-21; 72:18-75:22]. Hittos testified that she forwarded ideas submitted by constituents other than Plaintiff, but she could not recall to whom or how she forwarded Plaintiff's emails. [*Id*. at 62:16-21, 72:18-75:22].

### G. Litigation History

In his breach of contract implied in fact claims, Plaintiff alleges that BP agreed to compensate him "in the amount of at least two million" dollars if BP used his novel and concrete insertion pipe idea (count I), top hat with thermal lifting action idea (count II), and riser spool and two-pin design idea (count III). Each count alleges that BP in fact used his idea but failed to pay him. [*Id*. at ¶¶ 115-16, 121-22, 127-28].

In his unjust enrichment claims, Plaintiff alleges that he conferred a benefit to BP—the use of his novel and concrete insertion pipe idea (count IV), top hat with thermal lifting action

idea (count V), and riser spool and two-pin design idea (count VI)—and BP knowingly accepted and retained that benefit. [*Id*. at ¶¶ 130-31, 135-36, 140-41]. Each count alleges that BP's use of Plaintiff's idea has saved BP money by reducing its litigation liability and civil penalties by billions of dollars and that BP's failure to pay the value of his idea is inequitable under the circumstances. [*Id*. at ¶¶ 132-33, 137-38, 141-42].

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *See Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *See id.* When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts.

## III.    DISCUSSION

BP makes several alternate arguments as to why summary judgment should be entered in its favor on all of Plaintiff's breach of implied-in-fact contract and unjust enrichment claims, including: (1) federal patent law bars Plaintiff's claims, (2) Florida Statute § 501.972 bars Plaintiff's claims, and (3) Plaintiff's ideas were not used, novel, or concrete. BP also argues that Plaintiff's breach of implied-in-fact contract claims fail for an additional reason: no contract was formed because there was no "meeting of minds" regarding specific terms of the alleged

contract.   In his response opposing summary judgment, Plaintiff disagrees with all of BP's arguments.

However, the Court need not address all of BP's arguments because the determination of two—that Florida Statutes § 501.972 applies, and that BP never used Plaintiff's ideas—provide alternate bases for granting summary judgment in favor of BP on counts I through VI.

A.      **Florida Statute § 501.972**

BP argues that Plaintiff's breach of contract and unjust enrichment claims are barred by Section 501.972 of the Florida Statutes, which is titled "Actions based upon use of a creation that is not protected under federal copyright law," and states:

> (1) Except as provided in subsection (2), the use of an idea, procedure, process, system, method of operation, concept, principle, discovery, thought, or other creation that is not a work of authorship protected under federal copyright law does not give rise to a claim or cause of action, in law or in equity, unless the parties to the claim or cause of action have executed a writing sufficient to indicate that a contract has been made between them governing such use.
>
> (2) Subsection (1) does not affect or limit:
>
> > (a) Any cause of action based in copyright, trademark, patent, or trade secret; or
> >
> > (b) Any defense raised in connection with a cause of action described in paragraph (a).

Fla. Stat. § 501.972 (2006).

BP argues that this statute bars Plaintiff's claims because the record shows that BP did not sign (or write) any writing indicating the existence of a contract governing the use of Plaintiff's idea submissions.   In response, Plaintiff asserts that BP's argument is wrong because "[a] written contract is not required for" his claims.

The Florida Legislature enacted Section 501.972, effective July 1, 2006.  *See* 2006 Fla. Sess. Law, c. 2006-196, § 4.  BP does not provide any cases addressing the statute's scope or

otherwise interpreting the statutory language, and the Court's own research has found none. Given that the plain language of the statute requires understanding what would be protected under federal copyright law, the Court reviews relevant sections of the Copyright Act before interpreting Section 501.972 to determine how and whether it applies here.

Section 102(a) of the Copyright Act, titled "Subject matter of copyright," provides in part that copyright protection may extend to "original works of authorship fixed in any tangible medium of expression," including, for example, literary, musical, or architectural works.[5]   17 U.S.C § 102(a).  In contrast, Section 102(b), contains a "negative definition" by listing elements that do not fall within the scope of copyright protection:

> In no case does copyright protection for an original work of authorship extend to <u>any idea, procedure, process, system, method of operation, concept, principle, or discovery</u>, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C § 102(b) (emphasis added).   Thus, "ideas are substantively excluded from the protection of the Copyright Act," even though expression of ideas may be protected.   *Dunlap v. G&L Holding Group, Inc*., 381 F.3d 1285, 1295 (11th Cir. 2004) (holding that the plaintiff's "idea to create an Internet-based bank that would cater to the gay and lesbian community" was excluded from copyright protection); *id*. at 1294 (quoting *Nimmer on Copyright,* § 1.01[B][2][c] at 1-58 (2004) ("the Copyright Act does not extend protection to ideas as distinguished from their expression") (quotation marks omitted)).

Turning to Section 501.972(1), its language—regarding "use of an <u>idea, procedure, process, system, method of operation, concept, principle, discovery</u>, thought," *id*. (emphasis

---

[5] Section 102(a) states in full: "Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories: (1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works." 17 U.S.C § 102(a).

added)—shows that it applies to items that are excluded from copyright protection under Section 102(b) of the Copyright Act; and its language—regarding "use of . . . other creation that is not a work of authorship protected under federal copyright law," *id.* (emphasis added)—likewise shows that it applies to items that are not protected under Section 102(a).   Here, Plaintiff's ideas are not works of authorship and are expressly excluded from protection under the Copyright Act; Section 501.972 therefore applies to BP's use of Plaintiff's idea.

Further, Plaintiff has not asserted any cause of action that is excepted from the reach of Section 501.972(1).   His claims are neither "cause[s] of actions based in copyright, trademark, patent, or trade secret" nor "defense[s] raised in connection with" those causes of action.   Fla. Stat. § 501.972(2).   Thus, BP's use of Plaintiff's ideas cannot support his breach of implied-in-fact contract claims or his unjust enrichment claims, unless Plaintiff and BP "have executed a writing sufficient to indicate that a contract has been made between them governing such use." Fla. Stat. § 501.972(1).

Plaintiff's complaint contains no allegation—and the record lacks any facts reasonably showing—that BP executed any writing, let alone one sufficiently indicating that BP and Plaintiff made a contract governing BP's use of his ideas.   To the extent an email from BP to Plaintiff could constitute a "writing," BP's emails lack any indication that BP assented to any contract terms concerning the use of his ideas or that any of the other hallmarks of contract formation were addressed.   *See St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004) (a valid contract requires "offer, acceptance, consideration and sufficient specification of essential terms").   Rather, BP's emails responded to Plaintiff's ART submissions and notified him that his ideas could not be applied or had already been considered.   Nor is any email from Hittos a

communication from BP, as no facts show that she was BP's agent; and even if she could, no email indicates BP and Plaintiff made a contract governing BP's use of Plaintiff's ideas.

While Plaintiff is correct that a cause of action based on an implied-in-fact contract or an unjust enrichment theory does not require a written contract, statutes may impose limitations on such causes of actions.    For example, Florida's statute of frauds limits certain breach of oral contract causations where there is no "note or memorandum . . . in writing."  Fla. Stat. § 725.01; *H.P.B.C., Inc. v. Nor-Tech Powerboats, Inc.*, 946 So. 2d 1108, 1110 (Fla. Dist. Ct. App. 2006) (applying statute of frauds and holding that plaintiff's breach of oral contract claim failed as a matter of law).  Here, Section 501.972 limits causes of actions based on the use of an idea or other creation that is not a work of authorship protected under federal copyright law.    As the Florida Senate's Staff Analysis recognized, by requiring "that there be a writing to reflect an agreement of use between parties for a person to have a cause of action for the unauthorized use of a noncopyright-protected creation," Section 501.972 "would limit one's ability to prove a breach of implied contract by a party who has not administered a written agreement when sharing ideas with others."  Fla. S. Staff Analysis & Economic Impact Statement, S.B. 202 (Apr. 21, 2006).

Based on the record before the Court, viewed in the light most favorable to Plaintiff, there is no genuine issue of material fact regarding whether BP and Plaintiff executed any writing sufficient to indicate that they made a contract governing BP's alleged use of Plaintiff's ideas.  Under Section 501.972, Plaintiff's breach of contract and unjust enrichment claims based on BP's alleged use of Plaintiff's ideas are barred as a matter of Florida law.  Accordingly, BP's motion for summary judgment is granted on all counts.

**B.**     **Breach of Implied-In-Fact Contract Claims (Counts I-III) and Unjust Enrichment Claims (Counts IV-VI)**

However, even if Section 501.972 does not apply to bar Plaintiff's claims, BP would still be entitled to summary judgment on all counts, because the record shows no genuine issue of material fact as to whether BP used Plaintiff's ideas.

For each breach of implied-in-fact contract claim, Plaintiff must prove: (1) a valid contract existed between BP and Plaintiff, (2) BP materially breached their contract, and (3) the breach caused Plaintiff damages. *See Havens v. Coast Fla., P.A.*, 117 So. 3d 1179, 1181 (Fla. 2d DCA 2013). For each unjust enrichment claim, Plaintiff must prove: (1) Plaintiff conferred a benefit on BP, (2) BP had knowledge of the benefit, (3) BP accepted or retained the benefit, and (4) the circumstances show it would be inequitable for BP to retain, without paying the fair value of, the benefit. *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.,* 695 So. 2d 383, 386 (Fla. 4th DCA 1997).

Whether BP used Plaintiff's ideas is a fact material to, and in this case dispositive of, Plaintiff's claims. If BP did not use Plaintiff's ideas, BP did not breach their contract (even if the Court assumes a contract was formed) and was not conferred a benefit. No genuine issue of fact exists as to whether BP used any of Plaintiff's ideas, and BP is therefore entitled to summary judgment as a matter of law on counts I through VI.

Before analyzing each one of Plaintiff's ideas (and its related breach of implied-in-fact contract count and unjust enrichment count), the Court first reviews a set of facts regarding the ART review process. An idea submitted by a member of the general public—whether directly via a designated phone number, email, or Deepwater Horizon website, or indirectly via the constituent's congress member—was screened and evaluated under the four-stage ART review process. Only when an idea survived the four-stage ART process would the Deepwater Horizon

21

response teams consider it for potential use in the response efforts.  Thus, the response teams would not have considered an idea submitted by Plaintiff if his idea had not passed all four ART review stages.  These facts are not disputed by Plaintiff.   What Plaintiff does dispute is whether his ideas were in fact provided to the response teams.

### 1.   Insertion Pipe Idea: Count I (Breach of Implied-In-Fact Contract) and Count IV (Unjust Enrichment)

In counts I and IV, Plaintiff alleges that BP used his insertion pipe idea—to insert a smaller pipe into the broken pipe past the broken riser and to inflate sealing rings.  BP argues that it did not use his insertion pipe idea, because: (1) it was never submitted to the Deepwater Horizon response teams, and (2) it is different from the RITT implemented by BP.

#### a. *Plaintiff's insertion pipe idea was not provided to the response teams*

BP argues that Plaintiff's insertion pipe idea was never provided to the response teams, because his idea did not proceed beyond ART's first stage of preliminary screening, and because Hittos did not forward Plaintiff's communications regarding his insertion pipe idea.  In response, Plaintiff points to Hittos's deposition testimony that she "forwarded all of his emails" containing his ideas, and based on this, he argues that his insertion pipe idea was in fact provided to the response teams.  [Doc. 40 at 18].

However, evidence that Hittos forwarded Plaintiff's emails to someone at BP does not create a genuine issue as to whether his insertion pipe idea was submitted to the response teams.  No evidence shows that Hittos forwarded Plaintiff's emails to the response teams.  While the record, viewed in the light most favorable to Plaintiff, suggests Hittos may have forwarded Plaintiff's emails to UAC, Brian Miller, or some other BP representative, BP's affidavit establishes that BP representatives who received constituent submissions from congressional

staff members were instructed to send them to the ART team so that they could be reviewed under the four-stage ART vetting process, and to inform the congressional staff members to direct their constituents to the designated website for ART submissions.  This is consistent with the response that Hittos received after her May 25, 2010 email to Miller asking if there is any person at UAC to whom she could direct Plaintiff's emails.  She was advised to encourage Plaintiff to submit his ideas through the website designated for submissions for ART review.  No evidence indicates that Hittos forwarded Plaintiff's ideas to directly to the response teams.  Further, BP has provided an affidavit that Plaintiff's ideas were never submitted to the response teams because they never passed the first stage of the ART review process.

In addition, Plaintiff received emails from HST on May 12, 2010 and May 13, 2010, notifying him that his submissions could not be implemented.  As for Plaintiff's assertion that he participated in a 1:30 p.m. conference call with Hittos and BP representatives on May 13, 2010, during which he explained his insertion pipe idea, Plaintiff did not know who those BP representatives were and no evidence suggests that they were members of the response teams.

No genuine issue of fact exists that Plaintiff's insertion pipe idea was not provided to the response teams for consideration for potential use.  Accordingly, BP is entitled to summary judgment.

### b.  *Plaintiff's insertion pipe idea is not the same as BP's RITT*

Even if a genuine issue of fact existed as to whether the response teams received and considered Plaintiff's insertion pipe idea for potential use, summary judgment in BP's favor is still warranted.  In his complaint, Plaintiff's allegation that BP used his idea was based on his belief that the RITT implemented by BP was the same as his insertion pipe idea.  [Doc. 2 at ¶¶ 61, 64, 89-90].  However, it was not.

BP submitted an affidavit and an expert report in support of BP's argument that Plaintiff's idea was different from BP's RITT in multiple, significant ways.   For example, Plaintiff's idea used strain lines attached to top hats on the seafloor.   [Doc. 39, Ex. KK].   Further, a diverter or safety valve was a critical part of his insertion pipe idea.   [Pl. Depo. Tr., Doc. 52-2, 163:24-164:03].    BP's affidavit and expert report show that neither of these aspects were used on the RITT that was implemented, and the expert report concludes that BP's RITT was fundamentally different.   [Doc. 39, Exs. DD, E].

Plaintiff argues that the RITT Procedures (submitted for approval on May 11, 2010) do not illustrate the RITT that was ultimately implemented by BP.   However, Plaintiff's argument is mere conjecture and is unsupported by facts or evidence.   Plaintiff's remaining arguments in response are equally meritless.   Plaintiff argues that BP pre-dated or altered their evidence, but he presents no facts to support his claim.   Next, pointing to this litigation's pre-trial and discovery procedures, Plaintiff asserts that BP delayed the discovery process by producing documents seven days after the discovery deadline, and argues that the Court should not consider those documents.   Plaintiff contends he received the expert report on May 1, 2013.   However, this would have been timely under the Court's case management order.[6]   [Doc. 30].

The record, viewed in the light most favorable to Plaintiff, shows no genuine issue of material fact as to whether BP used his insertion pipe idea.   It did not.   Plaintiff's breach of implied-in-fact contract and unjust enrichment claims therefore fail.   Accordingly, BP's motion for summary judgment is granted as to count I and count IV.

---

[6] As for other documents produced after the discovery deadline, Plaintiff never filed any discovery-related motions and fails to show how a seven-day delay prejudiced his ability to carry his burden of proof in opposing BP's motion for summary judgment.

  **2.**  **Top Hat With Thermal Lifting Action Idea: Count II (Breach of Implied-In-Fact Contract) and Count V (Unjust Enrichment)**

In counts II and V, Plaintiff alleges that BP used his idea for a top hat with thermal lifting action, because BP modified all of its top hats to inject warm upper seawater into the top hat. [Doc. 2 at ¶¶ 74, 121, 137].

The record shows that Plaintiff suggested his top hat with thermal lifting action idea in several emails sent to Hittos. As discussed above, that Hittos may have forwarded these to someone at BP does not create a genuine issue of fact as to whether his top hat with thermal lifting action idea was submitted to the response teams for consideration.

Even if the record contained some evidence that the response teams considered Plaintiff's top hat with thermal lifting action idea, BP would still be entitled to summary judgment. BP submitted an affidavit and an expert report supporting BP's argument that Plaintiff's top hat with thermal lifting action idea was fundamentally different from what was implemented by BP. [Doc. 39, Exs. DD, E]. The affidavit and expert report's analysis show the factual differences between BP's top hat method and Plaintiff's top hat with thermal lifting action idea, and the expert report concludes that there are multiple, substantial differences. For example, Plaintiff's idea required injecting warm surface seawater into a top hat; but the mechanism implemented by BP did not inject warm water inside the top hat but pumped it down the riser. [Doc. 39, Ex. E at 13]. Further, Plaintiff's idea required placing the top hat over the end of the insertion pipe to collect 5% of the oil lost from the insertion pipe at the riser, while BP's top hat was placed over the LMRP and was used as the primary means of collection. [*Id*. at 12].

Plaintiff responds that BP did in fact inject water into the top hat. However, the sole support for his argument is a line taken from an article titled, "BP oil leak setback: 'Top hat' removed, oil flow unhindered," from the "McClatchy Washington Bureau" newspaper, reporting

on a press release from the United States Coast Guard.  [Doc. 40, Ex. H].  This unauthenticated article is impermissible hearsay that is insufficient to create a genuine dispute as to whether BP's top hat method involved injecting water into the riser, rather than the top hat.

Because the record clearly shows that Plaintiff's top hat with thermal lifting action idea was not submitted to the response teams and was not the same as that implemented by BP, there is no genuine issue of material fact as to whether BP used it.  Thus, Plaintiff's breach of implied-in-fact contract and unjust enrichment claims based on BP's use of Plaintiff's top hat with thermal lifting action idea fail.  Accordingly, BP's motion for summary judgment is granted as to count II and count V.

### 3. Riser Spool and Two-Pin Design Idea: Count III (Breach of Implied-In-Fact Contract) and Count VI (Unjust Enrichment)

In counts III and VI, Plaintiff alleges that BP's "capping stack" mechanism used his riser spool and two-pin design idea.  [Doc. 2 at ¶¶ 110, 127, 142].

The record indicates that Plaintiff sent his riser spool and two-pin design idea by emailing Hittos and by submitting forms for ART review.  However, Plaintiff received emails from HST notifying him that his submissions could not be implemented or had been previously considered.  The emails from HST show that his idea did not proceed beyond the first stage of ART review and therefore was never submitted to the response teams for consideration.  Further, as discussed above, that Hittos may have passed along his idea does not create a genuine issue as to whether it was submitted to the response teams.  Plaintiff has offered no evidence indicating that the response teams received and considered his ideas for potential use.  Accordingly, no genuine issue of material fact exists as to whether BP used Plaintiff's riser spool and two-pin design idea. It did not.

Summary judgment for BP is also warranted because the record shows that Plaintiff's riser spool and two-pin design idea was not the same as the mechanism implemented by BP. BP's expert report showed the substantial differences between BP's method and Plaintiff's riser spool and two-pin design idea.  [Doc. 39, Ex. E].  For example, Plaintiff's submission proposed removing the broken riser by unbolting the riser while it was still intact.  [*Id*. at 15].  However, BP's method was substantially different—BP used a diamond saw and shear to cut the riser into pieces before unbolting the remaining stub.  [*Id*.].  In an email to Hittos, Plaintiff even disagreed with the method of using a shear to cut the riser because it "could result in sustaining a totally unrecoverable situation."  [Ex. 39, Ex. NN].

Plaintiff's idea was also significantly different because it required aligning a "stint pipe" using only two pins of different lengths, whereas BP's method aligned the actual transition spool by using a "mule shoe" and rotating it until the guide pins (which did not require one long and one short pin) could engage.  [Ex. E at 15].  Plaintiff argues that the picture depicted in BP's motion for summary judgment contravenes BP's contention that it did not use two pins of different lengths.  However, even if this were true, Plaintiff fails to address the other differences between BP's method and Plaintiff's riser spool and two-pin design idea, which render their ideas substantially different.

Plaintiff's breach of implied-in-fact contract and unjust enrichment claims based on BP's use of his riser spool and two-pin design idea therefore fail.  Accordingly, BP's motion for summary judgment is granted as to count III and count VI.

## IV.   CONCLUSION

Accordingly, it is ORDERED AND ADJUDGED that the Motion for Summary Judgment filed by Defendants BP Exploration & Production Inc. and BP America Production

Co. [Doc. 39] is **GRANTED**.   The Clerk is directed to enter judgment in favor of Defendants and to close this case.

      **DONE AND ORDERED** at Tampa, Florida, this 24th day of September, 2013.


SUSAN C. BUCKLEW
United States District Judge


Copies To: Counsel of Record and Parties